**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **REDWOOD TECHNOLOGIES, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **v.** | § | |
| | § | |
| **VIVINT, INC.** | § | **C.A. NO. 6:23-cv-251** |
| | § | |
| **Defendant.** | § | |
| | § | |

## PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Redwood Technologies, LLC ("Redwood") files this Complaint against Defendant Vivint, Inc. ("Vivint" or "Defendant") for infringement of U.S. Patent No. 7,359,457 (the "'457 patent"), U.S. Patent No. 7,688,901 (the "'901 patent"), U.S. Patent No. 7,974,371 (the "'371 patent"), U.S. Patent No. 8,284,866 (the "'866 patent"), U.S. Patent No. 9,374,209 (the "'209 patent"), U.S. Patent No. 7,826,555 (the "'555 patent"), U.S. Patent No. 7,917,102 (the "'102 patent"), and U.S. Patent No. 7,983,140 (the "'140 patent"), collectively, the "Asserted Patents."

## THE PARTIES

1.    Redwood Technologies, LLC is a Texas limited liability company, with a principal place of business at 812 West McDermott Dr. #1038, Allen, TX 75013.

2.    On information and belief, Vivint, Inc. is a corporation organized and existing under the laws of Utah, having a principal place of business at 4931 North 300 West, Provo, Utah 84604. On information and belief, Vivint has business locations in this Judicial District, including at least at 3311 N Interstate Hwy 35 #101 Austin, TX 78722; and 15900 La Cantera Parkway #19210, San Antonio, TX 78256. On information and belief, Vivint may be served in Texas via its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

3.     Prior to the filing of the Complaint, Redwood sent a letter received by Vivint on November 8, 2021, where Redwood attempted to engage Vivint in licensing discussions related to the Asserted Patents for reasonable and non-discriminatory terms for a license to be taken in the absence of litigation. Vivint ignored Redwood's request to engage in licensing discussions. Indeed, Vivint has known about each of the Asserted Patents since at least November 8, 2021, when Vivint received notice of its infringement of the Asserted Patents via the letter sent by Redwood.

4.     Prior to the filing of the Complaint, Redwood sent another letter received by Vivint on May 23, 2022, where Redwood again attempted to engage Vivint in licensing discussions related to the Asserted Patents for reasonable and non-discriminatory terms for a license to be taken in the absence of litigation. Vivint again ignored Redwood's request to engage in licensing discussions. Indeed, Vivint has known about each of the Asserted Patents since at least May 23, 2022, when Vivint received the second notice of its infringement of the Asserted Patents via the letter sent by Redwood.

5.     Vivint's past and continuing making, using, selling, offering for sale, and/or importing, and/or inducing its subsidiaries, affiliates, retail partners, and customers in the making, using, selling, offering for sale, and/or importing the accused Wi-Fi compliant devices throughout the United States i) willfully infringe each of the Asserted Patents and ii) impermissibly take the significant benefits of Redwood's patented technologies without fair compensation to Redwood.

6.     Vivint is engaged in making, using, selling, offering for sale, and/or importing, and/or induces its subsidiaries, affiliates, retail partners, and customers in the making, using, selling, offering for sale, and/or importing throughout the United States, including within this District, products, such as access points, accused of infringement.

## JURISDICTION AND VENUE

7.    This action arises under the patent laws of the United States, namely 35 U.S.C. §§ 271, 281, and 284-285, among others.

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

9.    This Court has personal jurisdiction over Vivint in accordance with due process and/or the Texas Long Arm Statute because, among other things, Vivint does business in this State by, among other things, maintaining offices in this District, including maintaining its offices located at 3311 N Interstate Hwy 35 #101 Austin, TX 78722; and 15900 La Cantera Parkway #19210, San Antonio, TX 78256.

10.    Further, this Court has personal jurisdiction over Vivint because it has engaged, and continues to engage, in continuous, systematic, and substantial activities within this State, including the substantial marketing, making, using, and sale of products and services within this State and this District. Indeed, this Court has personal jurisdiction over Vivint because it has committed acts giving rise to Redwood's claims for patent infringement within and directed to this District, has derived substantial revenue from its goods and services provided to individuals in this State and this District, and maintains regular and established places of business in this District, including its places of business at 3311 N Interstate Hwy 35 #101 Austin, TX 78722; and 15900 La Cantera Parkway #19210, San Antonio, TX 78256.

11.    Relative to patent infringement, Vivint has committed and continues to commit acts in violation of 35 U.S.C. § 271, and has made, used, marketed, distributed, offered for sale, imported, and/or sold infringing products in this State, including in this District, and otherwise engaged in infringing conduct within and directed at, or from, this District. Such products have

3

been and continue to be offered for sale, distributed to, sold, and used in this District, and the infringing conduct has caused, and continues to cause, injury to Redwood, including injury suffered within this District. These are purposeful acts and transactions in this State and this District such that Vivint reasonably should know and expect that it could be haled into this Court because of such activities.

12.     In addition, Vivint has knowingly induced and continues to knowingly induce infringement within this District by advertising, marketing, offering for sale and/or selling devices pre-loaded with infringing functionality within this District, to consumers, customers, manufacturers, distributors, resellers, partners, and/or end users, and providing instructions, user manuals, advertising, and/or marketing materials which facilitate, direct or encourage the use of infringing functionality with knowledge thereof. As just one example, Vivint, via Vivint's employees and/or agents, induced and continues to induce Vivint's customers to infringe by showing them how to use the Accused Products in an infringing manner. *See, e.g.*, https://www.vivint.com/resources/article/vivint-professional-installation ("Your Smart Home Pro will show you how to operate your new system and answer any questions you may have. And if you happen to have any more after they leave, they're just a phone call away."; "Once installation is complete, your Smart Home Pro will train you on the various components of your system, answering any questions.").

13.     Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b) because Vivint has regular and established places of business in this District and has committed acts of infringement in this District. Vivint's regular and established places of business in this District include, at least, its facilities in 3311 N Interstate Hwy 35 #101 Austin, TX 78722; and 15900 La Cantera Parkway #19210, San Antonio, TX 78256.

14.     With respect to the Asserted Patents, the Accused Products are devices that include, but are not limited, to Defendant's devices that are compliant with IEEE 802.11n and/or IEEE 802.11ac and/or IEEE 802.11ax (*e.g.*, Smart Hub, Smart Hub Lite, AirBridge, Air Tower, Doorbell Camera, Doorbell Camera Pro (Gen 2), Doorbell Camera Pro, Ping Indoor IP Camera, Indoor Camera, Indoor Camera Pro, Fixed Camera (V520IR), Pan and Tilt Camera (V620PT), Glance Display (V-SHD1), SkyControl Panel, and Vivint Pro Display) and other devices, as well as, their components, and processes related to the same.[1]

## COUNT I
### (INFRINGEMENT OF U.S. PATENT NO. 7,359,457)

15.     Plaintiff incorporates paragraphs 1 through 14 herein by reference.

16.     Redwood is the assignee of the '457 patent, entitled "Transmission Apparatus, Reception Apparatus and Digital Radio Communication Method," with ownership of all substantial rights in the '457 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

17.     The '457 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '457 patent issued from U.S. Patent Application No. 10/827,445.

18.     Vivint has and continues to directly and/or indirectly infringe (by inducing infringement) one or more claims of the '457 patent in this judicial district and elsewhere in Texas and the United States.

19.     Vivint directly infringes the '457 patent via 35 U.S.C. § 271(a) by making, using, offering for sale, selling, and/or importing the Accused Products, their components and processes,

---

[1] Each of the relevant standards cited herein, and related to the Asserted Patents, are specifically incorporated into this Complaint.

and/or products containing the same that incorporate the fundamental technologies covered by the '457 patent. As just one example, Vivint, via Vivint's employees and/or agents, has installed, used, and tested the Accused Products in an infringing manner and continues to install, use, and test the Accused Products in an infringing manner. *See, e.g.*, https://www.vivint.com/resources/article/vivint-professional-installation ("Vivint Pros are literal professionals when it comes to smart home tech. Not only will they install everything, but they will make sure your smart home devices integrate together seamlessly."; "The actual installation itself may take about three hours, depending on your smart home configuration. During this time, your Smart Home Pro will install your panel and devices and then run tests to make sure everything is in perfect working order.").

20.     For example, Vivint infringes claim 1 of the '457 patent via the Accused Products, including the Vivint Smart Hub. The Accused Products, including the Vivint Smart Hub, each are compliant with IEEE 802.11n and/or IEEE 802.11ac and/or IEEE 802.11ax, and each comprise a transmission apparatus of claim 1.  *See, e.g.*, https://support.vivint.com/s/article/Products-Vivint-Smart-Hub-v2.

21.     The Accused Products, including the Vivint Smart Hub, each comprise circuitry and/or components (hardware and/or software) that determine a modulation system from among a plurality of modulation systems based on a communication situation. For example, the Accused Products utilize a Modulation and Coding Scheme (MCS) value that is used to determine the modulation, coding, and number of spatial channels based on information associated with a channel quality assessment. *See, e.g.*, Sections 19.3.5 and 19.3.13.4 of Part 11: Wireless LAN Medium Access Control (MAC) and Physical (PHY) Specifications of IEEE Std 802.11™ -2016 ("IEEE 802.11 2016"). Based on the results of the channel quality assessment, the Accused

Products select an appropriate MCS value from a plurality of MCS values. *See, e.g.*, Section 19.3.5 and Table 19-27 of IEEE 802.11 2016.

22.    The Accused Products, including the Vivint Smart Hub, each comprise circuitry and/or components (hardware and/or software) that modulate a digital transmission signal according to the modulation system previously determined and generates a first symbol. The first symbol comprises a first quadrature baseband signal. For example, the Accused Products, including the Vivint Smart Hub, generate a first data symbol (*e.g.*, Data), comprising a first quadrature baseband signal (*e.g.*, an OFDM signal before up-conversion to the carrier frequency), that is modulated according to the MCS value. *See, e.g.*, Section 19.3.5 and Figures 19-1 and 19-22 of IEEE 802.11 2016. The signal is a quadrature signal, in that it is expressed as a combination of sine and cosine waveforms. For example, when the 16-QAM modulation scheme is used, the following equation and constellation diagram are used to express the signal as a quadrature signal:

$$d = (I + jQ) \times K_{MOD} \qquad (17\text{-}20)$$



The signal is a quadrature signal because it is expressed with in-phase (I) and quadrature (Q)

components. The signal is a baseband signal in that it has not been up-converted to the frequency of its intended carrier wave:

The transmitted signal is described in complex baseband signal notation. The actual transmitted signal is related to the complex baseband signal by the relation shown in Equation (19-1).

$$r_{RF}(t) = \text{Re}\{r(t)\exp(j2\pi f_c t)\} \tag{19-1}$$

where

$f_c$        is the center frequency of the carrier

The transmitted RF signal is derived by modulating the complex baseband signal, which consists of several fields. The timing boundaries for the various fields are shown in Figure 19-4.

The mandatory PHY transmit procedure feature of annotated Figure 19-22 of IEEE 802.11 2016 is illustrated below:



**Figure 19-22—PHY transmit procedure (HT-mixed format PPDU)**

Furthermore, an annotated passage of Section 19.3.20 directed to the mandatory "PHY transmit procedure" for HT-mixed format PPDU is recited below:

**19.3.20 PHY transmit procedure**

There are three options for the transmit PHY procedure. The first two options, for which typical transmit procedures are shown in Figure 19-22 and Figure 19-23, are selected if the FORMAT field of the PHY-TXSTART.request(TXVECTOR) primitive is equal to HT_MF or HT_GF, respectively. These transmit procedures do not describe the operation of optional features, such as LDPC or STBC. The third option is to follow the transmit procedure in Clause 17 or Clause 18 if the FORMAT field is equal to NON_HT. Additionally, if the FORMAT field is equal to NON_HT, CH_BANDWIDTH indicates

23.    The option for the "transmit PHY procedure" as to the HT-mixed format PPDU is a mandatory feature of the standard. *See, e.g.*,

https://www.albany.edu/faculty/dsaha/teach/2019Spring_CEN574/slides/08_WLAN.pdf at slides 67-68 (the HT-mixed format PPDU is mandatory).  Thus, the Accused Devices, including the Vivint Smart Hub, must be configured pursuant to Figures 19-1 and 19-22, as described above.

24.    The Accused Products, including the Vivint Smart Hub, each comprise circuitry and/or components (hardware and/or software) that modulates the digital signal according to a predetermined modulation system and generates a second symbol. The second symbol comprises a second quadrature baseband signal. For example, the Accused Products, including the Vivint Smart Hub, generate a second data symbol (*e.g.*, the HT-SIG), comprising a second quadrature baseband signal (*e.g.*, OFDM signal before up-conversion to the carrier frequency), that is modulated according to a predetermined modulation system (*e.g.*, QBPSK). *See, e.g.*, Section 19.3.9.4.3 and Figures 19-1 and 19-22 of IEEE 802.11 2016  The signal is a quadrature signal, in that it is expressed as a combination of sine and cosine waveforms. For example, when the QBPSK modulation scheme is used, the following constellation diagram is used to express the signal as a quadrature signal:



**Figure 19-7—Data tone constellations in an HT-mixed format PPDU**

The signal is a quadrature signal because it is expressed with in-phase (I) and quadrature (Q) components. The signal is a baseband signal in that it has not been up-converted to the frequency of its intended carrier wave:

The transmitted signal is described in complex baseband signal notation. The actual transmitted signal is related to the complex baseband signal by the relation shown in Equation (19-1).

$$r_{RF}(t) = \text{Re}\{r(t)\exp(j2\pi f_c t)\} \tag{19-1}$$

where

$f_c$      is the center frequency of the carrier

The transmitted RF signal is derived by modulating the complex baseband signal, which consists of several fields. The timing boundaries for the various fields are shown in Figure 19-4.

25.    The specific ways in which the Accused Products, including the Vivint Smart Hub, are configured to support the aforementioned features of IEEE 802.11n and/or 802.11ac and/or 802.11ax are further detailed in confidential documents and/or source code that evidence infringement by the Accused Products, including the Vivint Smart Hub, as to at least Claim 1 of the '457 patent.

26.    Furthermore, the Accused Products, including the Vivint Smart Hub, are configured or implemented in an infringing manner with the features and functionality recited in at least Claim 1 of the '457 patent.

27.    The technology discussion above and the exemplary Accused Products provide context for Plaintiff's infringement allegations.

28.    The claims of the '457 Patent are patent eligible under 35 U.S.C. § 101. The '457 Patent is not directed to an ineligible abstract idea. For example, it is not a mathematical algorithm executed on a generic computer or a fundamental economic business practice. Instead, for example, it offers a technologically complex, particularized "transmission apparatus, reception apparatus and digital radio communication method capable of flexibly improving the data transmission efficiency and the quality of data." '457 Patent, 1:59-63. The '457 Patent provides a technical solution above, for example, by using a "[f]rame configuration determination section" that "judges the communication situation based on transmission path information" to determine a modulation system from a plurality of modulation systems, then generate symbols comprising quadrature baseband signals, including one symbol that is generated by modulating a digital transmission signal according to the selected modulation system and a second symbol that is generated by modulating the digital transmission signal according to a predetermined modulation system. `457 Patent, 3:36-48; claim 1. That solution is reflected in the claims of the '457 Patent such as independent claims 1 and 6.

29.    At a minimum, Vivint has known of the '457 patent at least as early as the filing date of the Complaint. In addition, Vivint has known about the '457 patent since at least November 8, 2021, when Vivint and/or its agents received notice of its infringement via a letter. Furthermore, Vivint has known about the '457 patent since at least May 23, 2022, when Vivint and/or its agents received notice of its infringement via another letter.

30.    On information and belief, since at least the above-mentioned dates when Vivint was on notice of its infringement, Vivint has actively induced, under U.S.C. § 271(b), its

distributors, customers, subsidiaries, importers, and/or consumers that import, use, purchase, offer to sell, or sell the Accused Products comprising all of the limitations of one or more claims of the '457 patent to directly infringe one or more claims of the '457 patent by using, offering for sale, selling, and/or importing the Accused Products. Since at least the notice provided on the above-mentioned dates, Vivint does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '457 patent. Vivint intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, testing and certifying features related to infringing features in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States. As just one example, Vivint, via Vivint's employees and/or agents, induced and continues to induce Vivint's customers to infringe by showing them how to use the Accused Products in an infringing manner. *See, e.g.*, https://www.vivint.com/resources/article/vivint-professional-installation ("Your Smart Home Pro will show you how to operate your new system and answer any questions you may have. And if you happen to have any more after they leave, they're just a phone call away."; "Once installation is complete, your Smart Home Pro will train you on the various components of your system, answering any questions.").

31.    On information and belief, despite having knowledge of the '457 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '457 patent,

Vivint has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Vivint's infringing activities relative to the '457 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

32.    Redwood has been damaged as a result of Vivint's infringing conduct described in this Count. Vivint is, thus, liable to Redwood in an amount that adequately compensates Redwood for Vivint's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**COUNT II**
(INFRINGEMENT OF U.S. PATENT NO. 7,688,901)

33.    Plaintiff incorporates paragraphs 1 through 32 herein by reference.

34.    Redwood is the assignee of the '901 patent, entitled "Transmission Method, Transmission Apparatus, and Reception Apparatus," with ownership of all substantial rights in the '901 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

35.    The '901 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '901 patent issued from U.S. Patent Application No. 10/486,895.

36.    Vivint has and continues to directly and/or indirectly infringe (by inducing infringement) one or more claims of the '901 patent in this judicial district and elsewhere in Texas and the United States.

37.    Vivint directly infringes the '901 patent via 35 U.S.C. § 271(a) by using and/or testing the Accused Products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '901 patent. As just one example, Vivint, via Vivint's employees and/or agents, has installed, used, and tested the Accused Products in an infringing manner and continues to install, use, and test the Accused Products in an infringing manner. *See, e.g.*, https://www.vivint.com/resources/article/vivint-professional-installation ("Vivint Pros are literal professionals when it comes to smart home tech. Not only will they install everything, but they will make sure your smart home devices integrate together seamlessly."; "The actual installation itself may take about three hours, depending on your smart home configuration. During this time, your Smart Home Pro will install your panel and devices and then run tests to make sure everything is in perfect working order.").

38.    For example, Vivint infringes claim 1 of the '901 patent via the Accused Products. The Accused Products, including the Vivint Smart Hub, transmit modulation signals. *See, e.g.*, Sections 19.1.1 and 19.1.2 of IEEE 802.11 2016; https://support.vivint.com/s/article/Products-Vivint-Smart-Hub-v2.

39.    The Accused Products, including the Vivint Smart Hub, each generate a plurality of modulation signals each of which is to be transmitted from a different one of a plurality of antennas, where each modulation signal is to include one or more preamble symbol groups each consisting of a plurality of preamble symbols used for demodulation. For example, the Accused Products generate modulation signals (*e.g.*, HT-mixed format PPDUs) which are transmitted from a plurality of antennas. *See, e.g.*, Sections 19.3.3 of IEEE 802.11 2016. Each OFDM symbol within a modulation signal comprises a pilot symbol sequence consisting of four pilot symbols used for demodulation. *See, e.g.*, Sections 17.3.5.9 and 19.3.11.10 of IEEE 802.11 2016.

40.    The Accused Products, including the Vivint Smart Hub, each insert the one or more preamble symbol groups at the same one or more temporal points in each modulation signal, wherein the one or more preamble symbol groups at the one or more temporal points are orthogonal to other preamble symbol groups at the same one or more temporal points with zero mutual correlation among the plurality of modulation signals, each preamble symbol having a non-zero amplitude, and each preamble symbol group consisting of preamble symbols the quantity of which is greater than that of the plurality of modulation signals to be transmitted. For example, each of the Accused Products insert one or more OFDM symbols comprising a pilot symbol sequence in each modulation signal, where each modulation signal sent from different antennas are transmitted simultaneously in time. *See, e.g.*, Section 19.3.11.10 of IEEE 802.11 2016. The pilot symbol sequences corresponding to different spatial streams are orthogonal at the same one or more temporal points with zero mutual correlation among the plurality of spatial streams. *See, e.g.*, Table 19-19 of IEEE 802.11 2016. The pilot symbols are BPSK modulated and have a non-zero amplitude. *See, e.g.*, Section 17.3.5.9 of IEEE 802.11 2016. Each pilot symbol sequence contains four pilot symbols, which is greater than the modulation signals to be transmitted by two or three antennas utilized by the Accused Products. *See, e.g.*, Sections 19.1.1 and 19.3.11.10 of IEEE 802.11 2016.

41.    The Accused Products, including the Vivint Smart Hub, each transmit the plurality of modulation signals, each comprising transmission data, which is different between the plurality of modulation signals, and the one or more preamble symbol groups, from the plurality of antennas, respectively, in an identical frequency band. For example, each of the Accused Products transmit the plurality of modulation signals comprising transmission data and the pilot symbol sequence from the two or three antennas in the same channel having a particular width (*e.g.*, 20 MHz). *See,*

*e.g.*, Section 19.3.15.1, Tables 19-28, 19-29, and 19-30, and Figure 17-13 of IEEE 802.11 2016. Each stream of data to be transmitted is divided into multiple spatial streams to form respective modulation signals having different transmission data during the encoding process. *See, e.g.*, Section 19.3.4 of IEEE 802.11 2016.

42.    The specific ways in which the Accused Products, including the Vivint Smart Hub, are configured to support the aforementioned features of IEEE 802.11n and/or 802.11ac and/or 802.11ax are further detailed in confidential documents and/or source code that evidence infringement by the Accused Products, including the Vivint Smart Hub, as to Claim 1 of the '901 patent.

43.    Furthermore, the Accused Products, including the Vivint Smart Hub, are configured or implemented in an infringing manner with the features and functionality recited in at least Claim 1 of the '901 patent.

44.    The technology discussion above and the exemplary Accused Products provide context for Plaintiff's infringement allegations.

45.    The claims of the '901 Patent are patent eligible under 35 U.S.C. § 101. The '901 Patent is not directed to an ineligible abstract idea. For example, it is not a mathematical algorithm executed on a generic computer or a fundamental economic business practice. Instead, it is a technologically complex, particularized method of transmitting modulation signals. As the '901 Patent explains, the "present invention aims to provide a transmission method for estimating channels accurately and with ease from multiplexed modulation signals." '901 Patent, 1:50-52. The '901 Patent further explains that the "conventional structure gives no thought to the synchronization between channels in the same frequency band as well as a frequency offset. As a result, this structure encounters the difficulty of achieving the most important factor in order to

demultiplex [sic] a multiplexed signal, namely, obtaining an accuracy of estimating channels." '901 Patent, 1:41-45.

46.     The '901 Patent provides the technical solution above by, for example, "plac[ing] the symbols used for demodulation at an identical time of the respective channels and orthogonally to each other." '901 Patent, 2:16-18. The '901 Patent explains that "[t]his preparation, i.e. the symbols used for demodulation are placed to be orthogonal to each other, allows the reception apparatus to isolate the symbols with ease for estimating channels." '901 Patent, 2:18-22. That solution is reflected in the claims of the '901 Patent such as independent claim 1.

47.     At a minimum, Vivint has known of the '901 patent at least as early as the filing date of the Complaint. In addition, Vivint has known about the '901 patent since at least November 8, 2021, when Vivint and/or its agents received notice of its infringement via a letter. Furthermore, Vivint has known about the '901 patent since at least May 23, 2022, when Vivint and/or its agents received notice of its infringement via another letter.

48.     On information and belief, since at least the above-mentioned dates when Vivint was on notice of its infringement, Vivint has actively induced, under U.S.C. § 271(b), its distributors, customers, testing outfits, subsidiaries, importers, and/or consumers that use and/or test the Accused Products comprising all of the limitations of one or more claims of the '901 patent to directly infringe one or more claims of the '901 patent by using and/or testing the Accused Products. Since at least the notice provided on the above-mentioned dates, Vivint does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '901 patent. Vivint intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or

maintaining established distribution channels for the Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, testing and certifying features related to infringing features in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States. As just one example, Vivint, via Vivint's employees and/or agents, induced and continues to induce Vivint's customers to infringe by showing them how to use the Accused Products in an infringing manner. *See, e.g.*, https://www.vivint.com/resources/article/vivint-professional-installation ("Your Smart Home Pro will show you how to operate your new system and answer any questions you may have. And if you happen to have any more after they leave, they're just a phone call away."; "Once installation is complete, your Smart Home Pro will train you on the various components of your system, answering any questions.").

49.    On information and belief, despite having knowledge of the '901 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '901 patent, Vivint has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Vivint's infringing activities relative to the '901 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

50.    Redwood has been damaged as a result of Vivint's infringing conduct described in this Count. Vivint is, thus, liable to Redwood in an amount that adequately compensates Redwood

for Vivint's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT III
### (INFRINGEMENT OF U.S. PATENT NO. 7,974,371)

51.     Plaintiff incorporates paragraphs 1 through 50 herein by reference.

52.     Redwood is the assignee of the '371 patent, entitled "Communication Method and Radio Communication Apparatus," with ownership of all substantial rights in the '371 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

53.     The '371 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '371 patent issued from U.S. Patent Application No. 10/486,896.

54.     Vivint has and continues to directly and/or indirectly infringe (by inducing infringement) one or more claims of the '371 patent in this judicial district and elsewhere in Texas and the United States.

55.     Vivint directly infringes the '371 patent via 35 U.S.C. § 271(a) by making, using, offering for sale, selling, and/or importing the Accused Products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '371 patent. As just one example, Vivint, via Vivint's employees and/or agents, has installed, used, and tested the Accused Products in an infringing manner and continues to install, use, and test the Accused Products in an infringing manner. *See, e.g.,* https://www.vivint.com/resources/article/vivint-professional-installation ("Vivint Pros are literal professionals when it comes to smart home tech. Not only will they install everything, but they will make sure your smart home devices integrate together seamlessly."; "The actual installation

itself may take about three hours, depending on your smart home configuration. During this time, your Smart Home Pro will install your panel and devices and then run tests to make sure everything is in perfect working order.").

56.     For example, Vivint infringes claim 14 of the '371 patent via the Accused Products, including the Vivint Smart Hub. The Accused Products, including the Vivint Smart Hub, comprise a radio transmission apparatus. *See, e.g.*, Fig. 19-2 of IEEE 802.11 2016; https://support.vivint.com/s/article/Products-Vivint-Smart-Hub-v2.

57.     The Accused Products, including the Vivint Smart Hub, each comprise circuitry and/or components (hardware and/or software) comprising a transmission method determining unit configured to select one of a first transmission method and a second transmission method based on received information of an estimated radio-wave propagation environment corresponding to a communication partner. For example, the Accused Products receive information associated with a channel quality assessment to select an appropriate Modulation and Coding Scheme (MCS) for Accused Products to utilize in subsequent transmissions to a receiving station, where the MCS value is utilized to determine the modulation, coding, and number of spatial channels based on information associated with the channel quality assessment. *See, e.g.*, Sections 19.3.13.4 and 19.3.5 of IEEE 802.11 2016.

58.     The Accused Products, including the Vivint Smart Hub, each comprise circuitry and/or components (hardware and/or software) comprising a modulation signal generator configured to generate a single modulation signal if said transmission method determining unit choose selects said first transmission method, and to generate a plurality of modulation signals which include different information from each other for transmission to an identical frequency band at an identical temporal point, if said transmission method determining unit selects said

second transmission method. For example, if the MCS indicates that a transmission will utilize only one spatial stream, the Accused Products generate a single modulation signal. *See, e.g.*, Section 19.3.5 of IEEE 802.11 2016. If the MCS indicates that a transmission will include multiple spatial streams for, *e.g.*, spatial multiplexing, a plurality of modulation signals are produced, where each of the modulation signals represents a respective spatial stream and each spatial stream includes distinct information. *See, e.g.*, Section 19.3.5 of IEEE 802.11 2016. Spatial multiplexing increases bandwidth by transmitting data over multiple available spatial channels. Transmissions are simultaneous and are transmitted using the same channel having a particular width (*e.g.*, 20 Mhz). *See, e.g.*, Section 19.3.15.1 and Tables 19-28, 19-29, and 19-30 of IEEE 802.11 2016.

59.    The single modulation signal and the plurality of modulation signals contain information indicating the number of modulation signals to multiplex and transmit at the same time. For example, all HT transmissions of the Accused Products, including the Vivint Smart Hub, utilize an HT-SIG, which contains an MCS that indicates the number of modulation signals to multiplex and transmit at the same time. *See, e.g.*, Sections 19.3.9.4.3 and 19.3.5 of IEEE 802.11 2016

60.    The specific ways in which the Accused Products, including the Vivint Smart Hub, are configured to support the aforementioned features of IEEE 802.11n and/or 802.11ac and/or 802.11ax are further detailed in confidential documents and/or source code that evidence infringement by the Accused Products as to at least Claim 14 of the '371 patent.

61.    Furthermore, the Accused Products, including the Vivint Smart Hub, are configured or implemented in an infringing manner with the features and functionality recited in at least Claim 14 of the '371 patent.

62.    The technology discussion above and the exemplary Accused Products provide context for Plaintiff's infringement allegations.

63.    The claims of the '371 Patent are patent eligible under 35 U.S.C. § 101. The '371 Patent is not directed to an ineligible abstract idea. For example, it is not a mathematical algorithm executed on a generic computer or a fundamental economic business practice. Instead, it offers, for example, a technologically complex communication method and a radio communication apparatus that, for example, "switches between the method of transmitting modulation signals of a plurality of channels to the same frequency band from a plurality of antennas and the method of transmitting a modulation signal of one channel from an antenna." '371 Patent, 4:27-31. This allows the transmitter to choose which of these transmission methods is used, based on estimated channel conditions. The '371 Patent explains that "when the communication method is used, which multiplexes modulation signals of a plurality of channels to the same frequency band, a receiver transmits the information of an estimated radio-wave propagation environment to a transmitter. The transmitter then selects a communication method based on the information. Multiplexing modulation signals of a plurality of channels to the same frequency band by using the foregoing method can increase the data transmission rate. At the same time, a radio communication apparatus of the present invention can advantageously demultiplex the multiplexed modulation signals received with ease." '371 Patent, 5:4-16. That solution is reflected in, for example, claim 14 of the '371 Patent.

64.    At a minimum, Vivint has known of the '371 patent at least as early as the filing date of the Complaint. In addition, Vivint has known about the '371 patent since at least November 8, 2021, when Vivint and/or its agents received notice of its infringement via a letter. Furthermore,

Vivint has known about the '371 patent since at least May 23, 2022, when Vivint and/or its agents received notice of its infringement via another letter.

65.    On information and belief, since at least the above-mentioned dates when Vivint was on notice of its infringement, Vivint has actively induced, under U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, use, purchase, offer to sell, or sell the Accused Products comprising all of the limitations of one or more claims of the '371 patent to directly infringe one or more claims of the '371 patent by using, offering for sale, selling, and/or importing the Accused Products. Since at least the notice provided on the above-mentioned dates, Vivint does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '371 patent. Vivint intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, testing and certifying features related to infringing features in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States. As just one example, Vivint, via Vivint's employees and/or agents, induced and continues to induce Vivint's customers to infringe by showing them how to use the Accused Products in an infringing manner. *See, e.g.,* https://www.vivint.com/resources/article/vivint-professional-installation ("Your Smart Home Pro will show you how to operate your new system and answer any questions you may have. And if you happen to have any more after they leave, they're just a phone call

away."; "Once installation is complete, your Smart Home Pro will train you on the various components of your system, answering any questions.").

66.    On information and belief, despite having knowledge of the '371 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '371 patent, Vivint has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Vivint's infringing activities relative to the '371 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

67.    Redwood has been damaged as a result of Vivint's infringing conduct described in this Count. Vivint is, thus, liable to Redwood in an amount that adequately compensates Redwood for Vivint's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT IV
### (INFRINGEMENT OF U.S. PATENT NO. 8,284,866)

68.    Plaintiff incorporates paragraphs 1 through 67 herein by reference.

69.    Redwood is the assignee of the '866 patent, entitled "OFDM Transmission Signal Generation Apparatus and Method, and OFDM Reception Data Generation Apparatus and Method," with ownership of all substantial rights in the '866 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

70.    The '866 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '866 patent issued from U.S. Patent Application No. 13/171,121.

71.    Vivint has and continues to directly and/or indirectly infringe (by inducing infringement) one or more claims of the '866 patent in this judicial district and elsewhere in Texas and the United States.

72.    Vivint directly infringes the '866 patent via 35 U.S.C. § 271(a) by making, using, offering for sale, selling, and/or importing the Accused Products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '866 patent. As just one example, Vivint, via Vivint's employees and/or agents, has installed, used, and tested the Accused Products in an infringing manner and continues to install, use, and test the Accused Products in an infringing manner. *See, e.g.*, https://www.vivint.com/resources/article/vivint-professional-installation ("Vivint Pros are literal professionals when it comes to smart home tech. Not only will they install everything, but they will make sure your smart home devices integrate together seamlessly."; "The actual installation itself may take about three hours, depending on your smart home configuration. During this time, your Smart Home Pro will install your panel and devices and then run tests to make sure everything is in perfect working order.").

73.    For example, Vivint infringes claim 1 of the '866 patent via the Accused Products, including the Vivint Smart Hub. The Accused Products, including the Vivint Smart Hub, comprise an OFDM transmission signal generation apparatus. *See, e.g.*, Figure 19-3 of IEEE 802.11 2016; https://support.vivint.com/s/article/Products-Vivint-Smart-Hub-v2.

74.    The Accused Products, including the Vivint Smart Hub, each comprise circuitry and/or components (hardware and/or software) configured to form a plurality of transmission signals, where each of the plurality of transmission signals comprises several pilot carriers, which are located in identical carrier positions among the plurality of transmission signals. For example,

each of the Accused Products comprises a spatial mapper configured to form a plurality of OFDM signals. *See, e.g.*, Section 19.3.3 and Figure 19-3 of IEEE 802.11 2016. Further, each of the OFDM signals contains, for example, four pilot carriers, in a 20MHz transmission, inserted in carrier positions of -21, -7, 7, and 21, or six pilot carriers, in a 40MHz transmission, inserted in carrier positions of -53, -25, -11, 11, 25, and 53. *See, e.g.*, Section 19.3.11.10 and Equation 19-54 of IEEE 802.11 2016. Orthogonal pilot sequences are assigned to identical time slots of pilot carriers in identical carrier positions among the plurality of OFDM signals, and identical pilot sequences are assigned to at least two of the OFDM signals. *See, e.g.*, Section 19.3.11.10 and Table 19-19 of IEEE 802.11 2016.

75.    The Accused Products, including the Vivint Smart Hub, each comprise circuitry and/or components (hardware and/or software) of an Inverse Fourier transform section configured to convert the plurality of transmission signals to a plurality of OFDM signals to be transmitted over an identical frequency band at an identical time. *See, e.g.*, Section 19.3.3 and Figure 19-3 of IEEE 802.11 2016. For example, the Accused Products are configured to send simultaneous transmissions that are transmitted using the same channel (*e.g.*, a channel having a width of 20 MHz). *See, e.g.*, Section 19.3.15.1 and Tables 19-28, 19-29, and 19-30 of IEEE 802.11 2016.

76.    The specific ways in which the Accused Products, including the Vivint Smart Hub, are configured to support the aforementioned features of IEEE 802.11 2016 are further detailed in confidential documents and/or source code that evidence infringement by the Accused Products as to Claim 1 of the '866 patent.

77.    Furthermore, the Accused Products, including the Vivint Smart Hub, are configured or implemented in an infringing manner with the features and functionality recited in at least Claim 1 of the '866 patent.

78.    The technology discussion above and the exemplary Accused Products provide context for Plaintiff's infringement allegations.

79.    The claims of the '866 Patent are patent eligible under 35 U.S.C. § 101. The '866 Patent is not directed to an ineligible abstract idea. For example, it is not a mathematical algorithm executed on a generic computer or a fundamental economic business practice. Instead, it offers, for example, a technologically complex MIMO-OFDM transmission apparatus and method that allows "realizing an ideal symbol configuration for frequency offset estimation, transmission path fluctuation (channel fluctuation) estimation and synchronization/signal detection, in MIMO-OFDM communication." '866 Patent, 1:21-24.

80.    The '866 Patent explains that "sufficient consideration has not been given to the method of transmitting symbols for transmission path estimation and symbols for frequency offset estimation to realize high accuracy frequency offset estimation, high accuracy transmission path fluctuation estimation and high accuracy synchronization/signal detection." '866 Patent, 1:21-24. The '866 Patent solves this problem with technical solutions. For example, the '866 Patent explains that, in a configuration of its invention, "orthogonal sequences are assigned to corresponding subcarriers among OFDM signals transmitted at the same time from the respective antennas in the time domain to form pilot carriers, so that, even when pilot symbols are multiplexed among a plurality of channels (antennas), it is possible to estimate frequency offset/phase noise with high accuracy." '866 Patent, 3:4-10. That solution is reflected in, for example, claim 1 of the '866 Patent.

81.    At a minimum, Vivint has known of the '866 patent at least as early as the filing date of the Complaint. In addition, Vivint has known about the '866 patent since at least November 8, 2021, when Vivint and/or its agents received notice of the '866 patent via a letter. Furthermore,

Vivint has known about the '866 patent since at least May 23, 2022, when Vivint and/or its agents received notice of its infringement via another letter.

82.     On information and belief, since at least the above-mentioned dates when Vivint was on notice of its infringement, Vivint has actively induced, under U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, use, purchase, offer to sell, or sell the Accused Products comprising all of the limitations of one or more claims of the '866 patent to directly infringe one or more claims of the '866 patent by using, offering for sale, selling, and/or importing the Accused Products. Since at least the notice provided on the above-mentioned dates, Vivint does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '866 patent. Vivint intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, testing and certifying features related to infringing features in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States. As just one example, Vivint, via Vivint's employees and/or agents, induced and continues to induce Vivint's customers to infringe by showing them how to use the Accused Products in an infringing manner. *See, e.g.*, https://www.vivint.com/resources/article/vivint-professional-installation ("Your Smart Home Pro will show you how to operate your new system and answer any questions you may have. And if you happen to have any more after they leave, they're just a phone call

away."; "Once installation is complete, your Smart Home Pro will train you on the various components of your system, answering any questions.").

83.    On information and belief, despite having knowledge of the '866 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '866 patent, Vivint has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Vivint's infringing activities relative to the '866 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

84.    Redwood has been damaged as a result of Vivint's infringing conduct described in this Count. Vivint is, thus, liable to Redwood in an amount that adequately compensates Redwood for Vivint's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## **COUNT V**
### (INFRINGEMENT OF U.S. PATENT NO. 9,374,209)

85.    Plaintiff incorporates paragraphs 1 through 84 herein by reference.

86.    Redwood is the assignee of the '209 patent, entitled "Transmission Signal Generation Apparatus, Transmission Signal Generation Method, Reception Signal Apparatus, and Reception Signal Method," with ownership of all substantial rights in the '209 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

87.     The '209 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '209 patent issued from U.S. Patent Application No. 14/703,938.

88.     Vivint has and continues to directly and/or indirectly infringe (by inducing infringement) one or more claims of the '209 patent in this judicial district and elsewhere in Texas and the United States.

89.     Vivint directly infringes the '209 patent via 35 U.S.C. § 271(a) by making, using, offering for sale, selling, and/or importing the Accused Products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '209 patent. As just one example, Vivint, via Vivint's employees and/or agents, has installed, used, and tested the Accused Products in an infringing manner and continues to install, use, and test the Accused Products in an infringing manner. *See, e.g.*, https://www.vivint.com/resources/article/vivint-professional-installation ("Vivint Pros are literal professionals when it comes to smart home tech. Not only will they install everything, but they will make sure your smart home devices integrate together seamlessly."; "The actual installation itself may take about three hours, depending on your smart home configuration. During this time, your Smart Home Pro will install your panel and devices and then run tests to make sure everything is in perfect working order.").

90.     For example, Vivint infringes claim 11 of the '209 patent via the Accused Products, including the Vivint Smart Hub. The Accused Products, including the Vivint Smart Hub, comprise a transmission signal generation apparatus configured to generate transmission signals (*e.g.*, HT-mixed format transmission signals). *See, e.g.*, Figure 19-2 of IEEE 802.11 2016; https://support.vivint.com/s/article/Products-Vivint-Smart-Hub-v2.

91.     The Accused Products, including the Vivint Smart Hub, each comprise circuitry and/or components (hardware and/or software) configured to generate one or more transmission signals, where each transmission signal includes a data frame having preamble information, pilot information, and data information. *See, e.g.*, Sections 19.3.3 and 19.3.20 and Figure 19-2 of IEEE 802.11 2016. Further, each of the transmission signals include the PHY preamble, at least four pilot symbols, and data information. *See, e.g.*, Sections 19.3.1, 19.3.11.10, and 19.3.20 of IEEE 802.11 2016.

92.     Each of the one or more transmission signals includes an associated preamble multiplied by a factor so that an average reception power of the associated preamble corresponds to an average reception power of the data information received with the associated preamble. For example, each of the transmission signals is multiplied by a normalization factor corresponding to the modulation scheme to achieve the same average power for all mappings, where the preamble and data information can have different modulation types and therefore different corresponding normalization factors. *See, e.g.*, Section 17.3.5.8, Table 17-11, Equation 17-20, and Figure 17.1 of IEEE 802.11 2016.

93.     Each of the one or more transmission signals includes plural pilot symbol sequences. For example, each of the transmission signals include at least four pilot symbols inserted in, for example, carrier positions -21, -7, 7, and 21. *See, e.g.*, Section 19.3.11.10 and Figure 19-3 of IEEE 802.11 2016.

94.     The Accused Products, including the Vivint Smart Hub, each comprise circuitry and/or components (hardware and/or software) of an Inverse Fourier transformer configured to generate for each of the one or more transmission signals a corresponding OFDM signal for

transmission by a corresponding one of one or more antennas by Inverse Fourier transforming each of the transmission signals. *See, e.g.*, Section 19.3.3 and Figure 19-3 of IEEE 802.11 2016.

95.    The Inverse Fourier transformer of each of the Accused Products, including the Vivint Smart Hub, is configured to arrange the pilot symbol sequences in corresponding pilot carriers during a first time period. For example, the Inverse Fourier transformer is configured to arrange pilot sequences in the pilot carriers of each OFDM symbol transmitted during a first time period (*e.g.*, the 3.2 μs DFT period). *See, e.g.*, Section 19.3.6, 19.3.11.10, 19.3.21, 19.4.3, and Equation 19-90 of IEEE 802.11 2016.

96.    The transmitter of each of the Accused Products, including the Vivint Smart Hub, is configured to arrange sets of the pilot carriers in a same carrier position in the OFDM signal, where the plural pilot symbol sequences are all orthogonal to each other. For example, the transmitter is configured to arrange pilot sequences for each space-time stream, where each of the OFDM signals contains four pilot carriers inserted in, for example, carrier positions -21, -7, 7, and 21. *See, e.g.*, Section 19.3.11.10, Equation 19-54, and Table 19-19 of IEEE 802.11 2016. Pilot sequences corresponding to different spatial streams are orthogonal to each other. *See, e.g.*, Table 19-19 of IEEE 802.11 2016.

97.    The specific ways in which the Accused Products, including the Vivint Smart Hub, are configured to support the aforementioned features of IEEE 802.11 2016 are further detailed in confidential documents and/or source code that evidence infringement by the Accused Products as to at least Claim 11 of the '209 patent.

98.    Furthermore, the Accused Products, including the Vivint Smart Hub, are configured or implemented in an infringing manner with the features and functionality recited in at least Claim 11 of the '209 patent.

99.     The technology discussion above and the exemplary Accused Products provide context for Plaintiff's infringement allegations.

100.     The claims of the '209 Patent are patent eligible under 35 U.S.C. § 101. The '209 Patent is not directed to an ineligible abstract idea. For example, it is not a mathematical algorithm executed on a generic computer or a fundamental economic business practice.

101.     The '209 Patent explains that "in the present circumstances, sufficient consideration has not been given to the method of transmitting symbols for transmission path estimation and symbols for frequency offset estimation to realize high accuracy frequency offset estimation, high accuracy transmission path fluctuation estimation and high accuracy synchronization/signal detection." '209 Patent, 2:53-59. The '209 Patent provides a technical solution to achieve high accuracy frequency offset by assigning orthogonal sequences to corresponding subcarriers among OFDM signals transmitted at the same time from the respective antennas in the time domain to form pilot carriers. '209 Patent, 3:9-15. The '209 Patent further explains that, in the technical solution of its invention, "since pilot symbols of each channel can be extracted without using a channel estimator value (transmission path fluctuation estimation value), it is possible to simplify the configuration of the section for compensating for the frequency offset/phase noise." '209 Patent, 3:15-19. Those solutions are reflected in, for example, claim 11 of the '209 Patent.

102.     At a minimum, Vivint has known of the '209 patent at least as early as the filing date of the Complaint. In addition, Vivint has known about the '209 patent since at least November 8, 2021, when Vivint and/or its agents received notice the '209 patent via a letter. Furthermore, Vivint has known about the '209 patent since at least May 23, 2022, when Vivint and/or its agents received notice of its infringement via another letter.

103.    On information and belief, since at least the above-mentioned dates when Vivint was on notice of its infringement, Vivint has actively induced, under U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, use, purchase, offer to sell, or sell the Accused Products comprising all of the limitations of one or more claims of the '209 patent to directly infringe one or more claims of the '209 patent by using, offering for sale, selling, and/or importing the Accused Products. Since at least the notice provided on the above-mentioned dates, Vivint does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '209 patent. Vivint intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, testing and certifying features related to infringing features in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States. As just one example, Vivint, via Vivint's employees and/or agents, induced and continues to induce Vivint's customers to infringe by showing them how to use the Accused Products in an infringing manner. *See, e.g.*, https://www.vivint.com/resources/article/vivint-professional-installation ("Your Smart Home Pro will show you how to operate your new system and answer any questions you may have. And if you happen to have any more after they leave, they're just a phone call away."; "Once installation is complete, your Smart Home Pro will train you on the various components of your system, answering any questions.").

104.    On information and belief, despite having knowledge of the '209 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '209 patent, Vivint has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Vivint's infringing activities relative to the '209 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

105.    Redwood has been damaged as a result of Vivint's infringing conduct described in this Count. Vivint is, thus, liable to Redwood in an amount that adequately compensates Redwood for Vivint's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT VI
### (INFRINGEMENT OF U.S. PATENT NO. 7,826,555)

106.    Plaintiff incorporates paragraphs 1 through 105 herein by reference.

107.    Redwood is the assignee of the '555 patent, entitled "MIMO-OFDM Transmission Device and MIMO-OFDM Transmission Method," with ownership of all substantial rights in the '555 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

108.    The '555 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '555 patent issued from U.S. Patent Application No. 11/577,791.

109.    Vivint has and continues to directly and/or indirectly infringe (by inducing infringement) one or more claims of the '555 patent in this judicial district and elsewhere in Texas and the United States.

110.    Vivint directly infringes the '555 patent via 35 U.S.C. § 271(a) by using and/or testing the Accused Products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '555 patent. As just one example, Vivint, via Vivint's employees and/or agents, has installed, used, and tested the Accused Products in an infringing manner and continues to install, use, and test the Accused Products in an infringing manner. *See, e.g.*, https://www.vivint.com/resources/article/vivint-professional-installation ("Vivint Pros are literal professionals when it comes to smart home tech. Not only will they install everything, but they will make sure your smart home devices integrate together seamlessly."; "The actual installation itself may take about three hours, depending on your smart home configuration. During this time, your Smart Home Pro will install your panel and devices and then run tests to make sure everything is in perfect working order.").

111.    For example, Vivint infringes claim 4 of the '555 patent via the Accused Products, including the Vivint Smart Hub. The Accused Products, including the Vivint Smart Hub, each are compliant with IEEE 802.11n and/or IEEE 802.11ac and/or IEEE 802.11ax, and each perform a MIMO-OFDM transmission method for transmitting OFDM-modulated data symbols from a plurality of antennas in a data transmission period and transmitting pilot symbols from specific carriers of the plurality of antennas in the data transmission period. *See, e.g.,* https://support.vivint.com/s/article/Products-Vivint-Smart-Hub-v2. For example, each of the Accused Products, including the Vivint Smart Hub, perform a MIMO-OFDM method for transmitting OFDM data symbols from two or more antennas in a data transmission period, such

that each transmitted OFDM symbol contains four pilot symbols, in a 20 MHz transmission, inserted in carrier positions -21, -7, 7, and 21.  *See, e.g.*, Sections 17.3.5.9, 19.1.1, 19.1.2, and 19.3.11.10 and Equation 19-54 of IEEE 802.11 2016. In another example, the Accused Products perform a method of transmitting OFDM symbols and their corresponding pilot symbols in a data transmission period (*e.g.*, the 3.2 μs DFT period). *See, e.g.*, Sections 19.3.6, 19.3.11.10, 19.3.21, 19.4.3, and Equation 19-90 of IEEE 802.11 2016.

112.    The Accused Products, including the Vivint Smart Hub, each perform an OFDM signal forming step of forming OFDM signals to be transmitted from the plurality of antennas. For example, the Accused Products form HT-mixed format PPDU signals into OFDM symbols to be transmitted from the two or more antennas. *See, e.g.*, Sections 19.1.1 and 19.3.4 of IEEE 802.11 2016.

113.    The Accused Products, including the Vivint Smart Hub, each perform a pilot carrier forming step of assigning orthogonal sequences to same carriers of the OFDM signals of a same time period. For example, each of the Accused Products perform a pilot carrier forming step of a same time period (*e.g.*, the 3.2 μs DFT period) by inserting pilot symbols in carrier positions -21, -7, 7, and 21 in each OFDM symbol, such that each sequence of the four pilot symbols is orthogonal to a corresponding sequence in the OFDM symbols of another space-time stream. *See, e.g.*, Section 19.3.11.10 and Equation 19-54 of IEEE 802.11 2016.

114.    When the OFDM signals are transmitted from two antennas of the Accused Products, including the Vivint Smart Hub, the Accused Products, including the Vivint Smart Hub, perform the pilot symbol mapping step forms the pilot carriers such that pilot signals of orthogonal sequences are used for same pilot carriers between a first antenna and a second antenna. For example, when there are two space-time streams used for transmission by the Accused Products,

the pilot sequences corresponding to stream one and stream two are orthogonal. *See, e.g.*, Table 19-19 of IEEE 802.11 2016.

115.    When the OFDM signals are transmitted from two antennas of the Accused Products, including the Vivint Smart Hub, the Accused Products, including the Vivint Smart Hub, perform the pilot symbol mapping step forms the pilot carriers such that pilot signals of different sequences are used for different pilot carriers at each of the first antenna and the second antenna. For example, within transmissions from each antenna, pilot values differ from one pilot subcarrier to another pilot subcarrier and pilot values corresponding to a given carrier repeat over OFDM symbols, such that pilot values corresponding to different subcarriers at each antenna are different. *See, e.g.*, Table 19-19 of IEEE 802.11 2016.

116.    When the OFDM signals are transmitted from two antennas of the Accused Products, including the Vivint Smart Hub, the Accused Products, including the Vivint Smart Hub, perform the pilot symbol mapping step to form the pilot carriers such that pilot signals of a same sequence are used at the first antenna and the second antenna.  For example, a cyclically rotated version of a same sequence of pilot values (*e.g.*, 1, 1, -1, -1) is repeated for each of the two antennas. *See, e.g.*, Table 19-19 of IEEE 802.11 2016.

117.    The specific ways in which the Accused Products, including the Vivint Smart Hub, are configured to support the aforementioned features of IEEE 802.11n and/or 802.11ac and/or 802.11ax are further detailed in confidential documents and/or source code that evidence infringement by the Accused Products as to Claim 4 of the '555 patent.

118.    Furthermore, the Accused Products, including the Vivint Smart Hub, are configured or implemented in an infringing manner with the features and functionality recited in at least Claim 4 of the '555 patent.

119.     The technology discussion above and the exemplary Accused Products provide context for Plaintiff's infringement allegations.

120.     The claims of the '555 Patent are patent eligible under 35 U.S.C. § 101. The '555 Patent is not directed to an ineligible abstract idea. For example, it is not a mathematical algorithm executed on a generic computer or a fundamental economic business practice. Instead, it offers, for example, a technologically complex MIMO-OFDM transmission method that allows "realizing an ideal symbol configuration for frequency offset estimation, transmission path fluctuation (channel fluctuation) estimation and synchronization/signal detection, in MIMO-OFDM communication." '555 Patent, 1:9-12.

121.     The '555 Patent explains that "sufficient consideration has not been given to the method of transmitting symbols for transmission path estimation and symbols for frequency offset estimation to realize high accuracy frequency offset estimation, high accuracy transmission path fluctuation estimation and high accuracy synchronization/signal detection." '555 Patent, 1:34-40. The '555 Patent solves this problem with technical solutions. For example, the '555 Patent explains that, in a configuration of its invention, "orthogonal sequences are assigned to corresponding subcarriers among OFDM signals transmitted at the same time from the respective antennas in the time domain to form pilot carriers, so that, even when pilot symbols are multiplexed among a plurality of channels (antennas), it is possible to estimate frequency offset/phase noise with high accuracy." '555 Patent, 2:60-66. That solution is reflected in, for example, claim 4 of the '555 Patent.

122.     At a minimum, Vivint has known of the '555 patent at least as early as the filing date of the Complaint. In addition, Vivint has known about the '555 patent since at least November 8, 2021, when Vivint and/or its agents received notice of the '555 patent via a letter. Furthermore,

Vivint has known about the '555 patent since at least May 23, 2022, when Vivint and/or its agents received notice of its infringement via another letter.

123.    On information and belief, since at least the above-mentioned date when Vivint was on notice of its infringement, Vivint has actively induced, under U.S.C. § 271(b), its distributors, customers, testing outfits, subsidiaries, importers, and/or consumers that use and/or test the Accused Products comprising all of the limitations of one or more claims of the '555 patent to directly infringe one or more claims of the '555 patent by using and/or testing the Accused Products. Since at least the notice provided on the above-mentioned dates, Vivint does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '555 patent. Vivint intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, testing and certifying features related to infringing features in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States. As just one example, Vivint, via Vivint's employees and/or agents, induced and continues to induce Vivint's customers to infringe by showing them how to use the Accused Products in an infringing manner. *See, e.g.*, https://www.vivint.com/resources/article/vivint-professional-installation ("Your Smart Home Pro will show you how to operate your new system and answer any questions you may have. And if you happen to have any more after they leave, they're just a phone call away."; "Once installation

is complete, your Smart Home Pro will train you on the various components of your system, answering any questions.").

124.    On information and belief, despite having knowledge of the '555 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '555 patent, Vivint has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Vivint's infringing activities relative to the '555 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

125.    Redwood has been damaged as a result of Vivint's infringing conduct described in this Count. Vivint is, thus, liable to Redwood in an amount that adequately compensates Redwood for Vivint's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT VII
### (INFRINGEMENT OF U.S. PATENT NO. 7,917,102)

126.    Plaintiff incorporates paragraphs 1 through 125 herein by reference.

127.    Redwood is the assignee of the '102 patent, entitled "Radio Transmitting Apparatus and Radio Transmission Method," with ownership of all substantial rights in the '102 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

128.    The '102 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '102 patent issued from U.S. Patent Application No. 11/937,422.

129.    Vivint has and continues to directly and/or indirectly infringe (by inducing infringement) one or more claims of the '102 patent in this judicial district and elsewhere in Texas and the United States.

130.    Vivint directly infringes the '102 patent via 35 U.S.C. § 271(a) by making, using, offering for sale, selling, and/or importing the Accused Products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '102 patent. As just one example, Vivint, via Vivint's employees and/or agents, has installed, used, and tested the Accused Products in an infringing manner and continues to install, use, and test the Accused Products in an infringing manner. *See, e.g.*, https://www.vivint.com/resources/article/vivint-professional-installation ("Vivint Pros are literal professionals when it comes to smart home tech. Not only will they install everything, but they will make sure your smart home devices integrate together seamlessly."; "The actual installation itself may take about three hours, depending on your smart home configuration. During this time, your Smart Home Pro will install your panel and devices and then run tests to make sure everything is in perfect working order.").

131.    For example, Vivint infringes claim 3 of the '102 patent via the Accused Products, including the Vivint Smart Hub. The Accused Products, including the Vivint Smart Hub, each are compliant with IEEE 802.11n and/or IEEE 802.11ac and/or IEEE 802.11ax, and each comprise a radio transmitting apparatus that transmits a modulated signal. *See, e.g.*, https://support.vivint.com/s/article/Products-Vivint-Smart-Hub-v2.

132.    The Accused Products, including the Vivint Smart Hub, each comprise circuitry and/or components (hardware and/or software) that forms a transmission frame which includes a frequency offset estimation signal for estimating frequency offset of the modulated signal at a

receiving apparatus, a channel fluctuation estimation signal for estimating channel fluctuation of the modulated signal at the receiving apparatus and a gain control signal for performing gain control of the modulated signal at the receiving apparatus. The Accused Products, including the Vivint Smart Hub, must be configured to form the claimed "transmission frame" for a HT-mixed format PPDU frame, which is a mandatory feature of IEEE 802.11 2016. *See, e.g.*, Figure 19-1 of IEEE 802.11 2016; https://www.albany.edu/faculty/dsaha/teach/2019Spring_CEN574/slides/08_WLAN.pdf at slides 67-68 (the HT-mixed format PPDU is mandatory). For example, the Accused Products, including the Vivint Smart Hub, each form a HT-mixed format PPDU frame, which comprises an L-LTF subframe, which is a frequency offset estimation signal. *See, e.g.*, Figures 17-4 and 19-1 of IEEE 802.11 2016. The HT-mixed format PPDU frame also comprises an HT-LTF subframe, which is a channel fluctuation estimation signal. *See, e.g.*, Figure 19-1 and Section 19.3.9.4.6 of IEEE 802.11 2016. The HT-mixed format PPDU frame also comprises an L-STF subframe, which is a gain control signal. *See, e.g.*, Figure 19-1 and Section 19.3.9.3.3 of IEEE 802.11 2016.

133. The Accused Products, including the Vivint Smart Hub, each comprise circuitry and/or components (hardware and/or software) configured to transmit the transmission frame. For example, the Accused Products, including the Vivint Smart Hub, must be configured to transmit a transmission frame for a HT-mixed format PPDU, which is a mandatory feature of IEEE 802.11 2016. *See, e.g.*, Figure 19-1 of IEEE 802.11 2016; https://www.albany.edu/faculty/dsaha/teach/2019Spring_CEN574/slides/08_WLAN.pdf at slides 67-68 (the HT-mixed format PPDU is mandatory).

134. The transmission frame includes a first gain control signal and a second gain control signal. For example, the HT-mixed format PPDU comprises a first gain control signal in the L-

STF subframe and a second gain control signal in the HT-STF subframe. *See, e.g.*, Figure 19-1 and Sections 19.3.9.3.3 and 19.3.9.4.5 of IEEE 802.11 2016. The first gain control signal is arranged prior to the frequency offset estimation signal. For example, the L-STF subframe is arranged prior to the L-LTF subframe. *See, e.g.*, Figure 19-1 of IEEE 802.11 2016. The second gain control is arranged subsequent to the frequency offset estimation signal and prior to the channel fluctuation estimation signal. For example, the HT-STF subframe is arranged subsequent to the L-LTF subframe and prior to the HT-LTF subframe. *See, e.g.*, Figure 19-1 of IEEE 802.11 2016.

135.    The specific ways in which the Accused Products, including the Vivint Smart Hub, are configured to support the aforementioned features of IEEE 802.11n and/or 802.11ac and/or 802.11ax are further detailed in confidential documents and/or source code that evidence infringement by the Accused Products as to Claim 3 of the '102 patent.

136.    Furthermore, the Accused Products, including the Vivint Smart Hub, are configured or implemented in an infringing manner with the features and functionality recited in at least Claim 3 of the '102 patent.

137.    The technology discussion above and the exemplary Accused Products provide context for Plaintiff's infringement allegations.

138.    The claims of the '102 Patent are patent eligible under 35 U.S.C. § 101. The '102 Patent is not directed to an ineligible abstract idea. For example, it is not a mathematical algorithm executed on a generic computer or a fundamental economic business practice. Instead, for example, it offers a technologically complex, particularized "radio transmitting apparatus and radio transmission method that enable[s] reception quality to be improved by reducing pilot symbol and data symbol quantization error in a system in which the number of simultaneously

transmitted modulated signals is changed according to the propagation environment and so forth." '102 Patent, 2:12-18. The '102 Patent provides the technical solution above, for example, by "changing the transmit power of the modulated signal transmitted from each antenna according to the number of antennas that simultaneously transmit modulated signals (that is, the number of modulated signals)." '102 Patent, 2:19-22. That solution is reflected in the claims 1, 3, 5, and 10 of the '102 Patent, which include, for example, gain control limitations that can be used in the changing of the transmit power of the modulated signals. *See, e.g.*, '102 Patent, 17:34-50.

139. At a minimum, Vivint has known of the '102 patent at least as early as the filing date of the Complaint. In addition, Vivint has known about the '102 patent since at least November 8, 2021, when Vivint and/or its agents received notice of its infringement via a letter. Furthermore, Vivint has known about the '102 patent since at least May 23, 2022, when Vivint and/or its agents received notice of its infringement via another letter.

140. On information and belief, since at least the above-mentioned date when Vivint was on notice of its infringement, Vivint has actively induced, under U.S.C. § 271(b), its distributors, customers, subsidiaries, importers, and/or consumers that import, use, purchase, offer to sell, or sell the Accused Products comprising all of the limitations of one or more claims of the '102 patent to directly infringe one or more claims of the '102 patent by using, offering for sale, selling, and/or importing the Accused Products. Since at least the notice provided on the above-mentioned date, Vivint does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '102 patent. Vivint intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the  Accused Products into and

within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, testing and certifying features related to infringing features in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States. As just one example, Vivint, via Vivint's employees and/or agents, induced and continues to induce Vivint's customers to infringe by showing them how to use the Accused Products in an infringing manner. *See, e.g.*, https://www.vivint.com/resources/article/vivint-professional-installation ("Your Smart Home Pro will show you how to operate your new system and answer any questions you may have. And if you happen to have any more after they leave, they're just a phone call away."; "Once installation is complete, your Smart Home Pro will train you on the various components of your system, answering any questions.").

141.    On information and belief, despite having knowledge of the '102 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '102 patent, Vivint has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Vivint's infringing activities relative to the '102 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

142.    Redwood has been damaged as a result of Vivint's infringing conduct described in this Count. Vivint is, thus, liable to Redwood in an amount that adequately compensates Redwood

for Vivint's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT VIII

### (INFRINGEMENT OF U.S. PATENT NO. 7,983,140)

143.    Plaintiff incorporates paragraphs 1 through 142 herein by reference.

144.    Redwood is the assignee of the '140 patent, entitled "Transmitting Apparatus, Receiving Apparatus, and Communication System for Formatting Data," with ownership of all substantial rights in the '140 patent, including the right to exclude others and to enforce, sue, and recover damages for past and future infringements.

145.    The '140 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. The '140 patent issued from U.S. Patent Application No. 11/004,256.

146.    Vivint has and continues to directly and/or indirectly infringe (by inducing infringement) one or more claims of the '140 patent in this judicial district and elsewhere in Texas and the United States.

147.    Vivint directly infringes the '140 patent via 35 U.S.C. § 271(a) by making, using, offering for sale, selling, and/or importing the Accused Products, their components and processes, and/or products containing the same that incorporate the fundamental technologies covered by the '140 patent. As just one example, Vivint, via Vivint's employees and/or agents, has installed, used, and tested the Accused Products in an infringing manner and continues to install, use, and test the Accused Products in an infringing manner. *See, e.g.*, https://www.vivint.com/resources/article/vivint-professional-installation ("Vivint Pros are literal professionals when it comes to smart home tech. Not only will they install everything, but they will make sure your smart home devices integrate together seamlessly."; "The actual installation

47

itself may take about three hours, depending on your smart home configuration. During this time, your Smart Home Pro will install your panel and devices and then run tests to make sure everything is in perfect working order.").

148.    For example, Vivint infringes claim 1 of the '140 patent via the Accused Products, including the Vivint Smart Hub. The Accused Products, including the Vivint Smart Hub, comprise a transmitting apparatus, in an orthogonal frequency division multiplexing communication system. *See, e.g.*, https://support.vivint.com/s/article/Products-Vivint-Smart-Hub-v2.

149.    The Accused Products, including the Vivint Smart Hub, each comprise circuitry and/or components (hardware and/or software) for converting a transmission signal into a transmission time slot. For example, the Accused Products, including the Vivint Smart Hub, convert PSDUs into PPDUs. *See, e.g.*, Sections 17.3.1 and 17.3.2.1 of IEEE 802.11 2016.

150.    The Accused Products, including the Vivint Smart Hub, each comprise circuitry and/or components (hardware and/or software) for generating a frame that includes a series of n (greater than 1) time slots and a frame guard period added to the series of n time slots, where each time slot includes an effective symbol period and guard period added to the effective symbol period, where the length of the series of n time slots is less than the length of the frame. For example, each of the Accused Products, including the Vivint Smart Hub, generates a PPDU frame that comprises a series of time slots associated with the signal and data OFDM symbols. *See, e.g.*, Figures 17-1 and 17-4 of IEEE 802.11 2016. Each of the Accused Products, including the Vivint Smart Hub, generates cyclic shifts that are added to the series of n time slots. *See, e.g.*, Sections 19.3.4 and 19.3.9.3.2 of IEEE 802.11 2016. Each time slot in the PPDU frame comprises an effective symbol period, and a guard period is added at the start of each effective symbol period. *See, e.g.*, Table 19-6 and Figure 17-4 of IEEE 802.11 2016. Further, the length of the series of n

time slots is less than the total length of the PPDU frame. *See, e.g.*, Figure 17-4 of IEEE 802.11 2016.

151.    The Accused Products, including the Vivint Smart Hub, each comprise circuitry and/or components (hardware and/or software) for transmitting the generated frame as a radio signal. *See, e.g.*, Section 17.3.8.2 of IEEE 802.11 2016.

152.    The specific ways in which the Accused Products, including the Vivint Smart Hub, are configured to support the aforementioned features of IEEE 802.11n and/or 802.11ac and/or 802.11ax are further detailed in confidential documents and/or source code that evidence infringement by the Accused Products as to at least Claim 1 of the '140 patent.

153.    Furthermore, the Accused Products, including the Vivint Smart Hub, are configured or implemented in an infringing manner with the features and functionality recited in at least Claim 1 of the '140 patent.

154.    The technology discussion above and the exemplary Accused Products provide context for Plaintiff's infringement allegations.

155.    The claims of the '140 Patent are patent eligible under 35 U.S.C. § 101. The '140 Patent is not directed to an ineligible abstract idea. For example, it is not a mathematical algorithm executed on a generic computer or a fundamental economic business practice. Instead, it is a technologically complex, particularized method of signal conversion and transmission. The '140 Patent explains a problem that exists in cellular networks, namely that different cells transmitting in the same frequency will interfere with each other. *See, e.g.*, '140 Patent, 1:30-32. That interference can be solved by having the different cells use different frequencies, but that solution causes another problem, i.e., decreased spectrum efficiency. *See, e.g.*, '140 Patent, 1:30-44. Thus, '140 Patent explains, "it is important to design a communication system such that the system has

high resistance against interference thereby achieving an improvement in the spectrum efficiency". '140 Patent, 1:45-47.

156.    The '140 Patent provides a technical solution to that technical problem by implementing "an improvement in a format of data that is modulated and transmitted using, for example, an OFDM (Orthogonal Frequency Division Multiplexing) technique." '140 Patent, 1:14-17. The claims of the '140 Patent provide for a specific format of transmission for that purpose. For example, the "frame" in claim 1 includes a "a frame guard period added to the series of n time slots." As the '140 Patent explains, when "no frame guard is used, the interfering wave IFW interferes with two frames of the desired wave DSW. In contrast, in the communication system according to the present embodiment of the invention, a frame guard included in an OFDM signal prevents the interfering wave IFW from interfering with the second frame, as shown in FIGS. 15(A) and 15(B)." '140 Patent, 18:63-19:2.  This helps achieve the goal of the of the '140 Patent of "suppression of a frame loss due to interference caused by use of the same channel." Id. at 3:32-33. Thus, the claimed transmission apparatus uses a transmission format designed to add efficiency to the transmission process in a particular manner. As such, the recited transmission apparatus is a concrete technical contribution and not simply the embodiment of an abstract idea.

157.    At a minimum, Vivint has known of the '140 patent at least as early as the filing date of the Complaint. In addition, Vivint has known about the '140 patent since at least November 8, 2021, when Vivint and/or its agents received notice of its infringement via a letter. Furthermore, Vivint has known about the '140 patent since at least May 23, 2022, when Vivint and/or its agents received notice of its infringement via another letter.

158.    On information and belief, since at least the above-mentioned date when Vivint was on notice of its infringement, Vivint has actively induced, under U.S.C. § 271(b), its distributors,

customers, subsidiaries, importers, and/or consumers that import, use, purchase, offer to sell, or sell the Accused Products comprising all of the limitations of one or more claims of the '140 patent to directly infringe one or more claims of the '140 patent by using, offering for sale, selling, and/or importing the Accused Products. Since at least the notice provided on the above-mentioned date, Vivint does so with knowledge, or with willful blindness of the fact, that the induced acts constitute infringement of the '140 patent. Vivint intends to cause, and has taken affirmative steps to induce infringement by its distributors, importers, customers, subsidiaries, and/or consumers by at least, inter alia, creating advertisements that promote the infringing use of the Accused Products, creating and/or maintaining established distribution channels for the  Accused Products into and within the United States, manufacturing the Accused Products in conformity with U.S. laws and regulations, distributing or making available instructions or manuals for these products to purchasers and prospective buyers, testing and certifying features related to infringing features in the Accused Products, and/or providing technical support, replacement parts, or services for these products to these purchasers in the United States. As just one example, Vivint, via Vivint's employees and/or agents, induced and continues to induce Vivint's customers to infringe by showing them how to use the Accused Products in an infringing manner. *See, e.g.*, https://www.vivint.com/resources/article/vivint-professional-installation ("Your Smart Home Pro will show you how to operate your new system and answer any questions you may have. And if you happen to have any more after they leave, they're just a phone call away."; "Once installation is complete, your Smart Home Pro will train you on the various components of your system, answering any questions.").

159.    On information and belief, despite having knowledge of the '140 patent and knowledge that it is directly and/or indirectly infringing one or more claims of the '140 patent,

Vivint has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Vivint's infringing activities relative to the '140 patent have been, and continue to be, willful, wanton, malicious, in bad-faith, deliberate, consciously wrongful, flagrant, characteristic of a pirate, and an egregious case of misconduct beyond typical infringement such that Plaintiff is entitled under 35 U.S.C. § 284 to enhanced damages up to three times the amount found or assessed.

160.    Redwood has been damaged as a result of Vivint's infringing conduct described in this Count. Vivint is, thus, liable to Redwood in an amount that adequately compensates Redwood for Vivint's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## CONCLUSION

161.    Plaintiff Redwood is entitled to recover from Vivint the damages sustained by Plaintiff as a result of Vivint's wrongful acts, and willful infringement, in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court.

162.    Plaintiff has incurred and will incur attorneys' fees, costs, and expenses in the prosecution of this action. The circumstances of this dispute may give rise to an exceptional case within the meaning of 35 U.S.C. § 285, and Plaintiff is entitled to recover its reasonable and necessary attorneys' fees, costs, and expenses.

## JURY DEMAND

163.    Plaintiff hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

164.    Plaintiff respectfully requests that the Court find in its favor and against Vivint, and that the Court grant Plaintiff the following relief:

1.    A judgment that Vivint has infringed the Asserted Patents as alleged herein, directly and/or indirectly by way of inducing infringement of such patents;

2.    A judgment for an accounting of all damages sustained by Plaintiff as a result of the acts of infringement by Vivint;

3.    A judgment and order requiring Vivint to pay Plaintiff damages under 35 U.S.C. § 284, including up to treble damages as provided by 35 U.S.C. § 284, and any royalties determined to be appropriate;

4.    A judgment and order requiring Vivint to pay Plaintiff pre-judgment and post-judgment interest on the damages awarded;

5.    A judgment and order finding this to be an exceptional case and requiring Vivint to pay the costs of this action (including all disbursements) and attorneys' fees as provided by 35 U.S.C. § 285; and

6.    Such other and further relief as the Court deems just and equitable.

Dated: April 5, 2023

Respectfully submitted,

*/s/ Patrick J. Conroy*
Patrick J. Conroy
Texas Bar No. 24012448
T. William Kennedy Jr.
Texas Bar No. 24055771
Jon Rastegar
Texas Bar No. 24064043
**Nelson Bumgardner Conroy PC**
2727 N. Harwood St.
Suite 250
Dallas, TX 75201
Tel: (214) 446-4950
pat@nelbum.com
bill@nelbum.com
jon@nelbum.com

John P. Murphy
Texas Bar No. 24056024
**Nelson Bumgardner Conroy PC**
3131 W 7th St
Suite 300
Fort Worth, TX 76107
Tel: (817) 377-9111
murphy@nelbum.com

**Attorneys for Plaintiff**
**Redwood Technologies, LLC**